[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Nature of Proceedings
By petitions filed December 10, 1990, the Department of Children and Youth Services (DCYS) seeks to terminate the parental rights of Cheryl C. and Raphael C., mother and acknowledged father of Joshua Ch., born April 4, 1986, and Shawn Ch., born July 19, 1988. Since both boys were placed in the custody of DCYS as babies — Joshua at 15 months; Shawn at a year old — and subsequently committed as neglected pursuant to Sec. 46b-129 of the Conn. Gen. Stats. (Rev. 1991), these actions were brought under Sec. 17a-112 applicable to such committed children. Grounds alleged as to both parents were failure to rehabilitate, denial of necessary care by parental acts, and the absence of parent-child relationship. In addition, abandonment was alleged as to the father. The latter, whose whereabouts were unknown at the time of filing, was served by publication and later at his place of employment. Although he failed to appear at the first two scheduled hearings, counsel was appointed for him, and both he and his attorney appeared at a pretrial conference held on February 5, 1991. He participated in the first two days of trial, failed to appear on the next two, and reappeared with counsel on the final trial day, June 5, 1991 when he executed a voluntary consent to the termination of his parental rights. After canvas, such consent was found to have been given voluntarily, knowingly and with advice of counsel and accepted as a valid CT Page 7174 basis for the relief sought.
Cheryl appeared at all scheduled court hearings and conferences with her separate counsel. Following trial, decision was reserved on her motion to dismiss the second and third grounds pleaded (denial of necessary care; absence of parent-child relationship). All parties were given permission to file trial memoranda by July 3, 1991, the date at which the period of reserved decision is deemed to have begun.
Facts
Evidence offered in five trial days, interpreted in the light of the prior record in this court concerning these children and their parents, supports the following findings of fact:
Joshua and Shawn are the youngest two of four children born during the 18-year relationship between Cheryl and Raphael. The older two were previously removed from parental custody through actions in other courts: The oldest child, now 14, has been adopted by the foster parents with whom Joshua and Shawn currently live; the second child, now eight, lives out of state, but whether adopted or not is unknown.
Cheryl's history of substance abuse began at 14 when she was hospitalized for a year at Norwich hospital for this problem. She left the hospital, travelled in Florida, and on her return began a relationship with Raphael which has continued to the present time despite their continuing problems with drugs, family violence, criminal arrests, and intermittent separations and reunions. (State's Exh. K. p. 6-7) They have never married nor has Raphael ever supported these children.
The parents have already lost custody of their two older children at the time Joshua was born on April 4, 1986. When he was 15 months old, his mother was seen falling down while carrying him when appearing to be intoxicated. When the police intervened, they found the baby to have bruises on his head, around both eyes, and on an extended portion of his buttocks. Cheryl was arrested on drug charges and risk of injury, and the parents subsequently gave permission to DCYS to place Joshua in foster care. Three months later, DCYS filed a neglect petition and on December 23, 1987, with his mother's agreement, he was found to have been neglected and committed to DCYS which has retained guardianship ever since. Raphael did not appear for this proceeding. At the time of commitment, both Cheryl and her attorney signed a list of the court's expectations for reunification (State's Exh. A) which included continued substance abuse counselling, already initiated, and weekly CT Page 7175 visitation. She thereafter cooperated with both a court ordered psychological evaluation (State's Exh. J.) and later with a psychiatric evaluation which had been recommended by the psychologist. (Not offered as an exhibit but contained in the court record.) The psychologist, finding her to be depressed and unstable and lacking any satisfactory plan for reunifying with her son, had "strong reservations about the rehabilitative capacities of the mother" (Id. p. 3). Later, to the psychiatrist, Cheryl revealed a history of "deprivation and abuse" (report of Dr. Richard Sadler, dated March 2, 1988, contained in the court record, at p. 2): While living with her own mother she had been exposed to physical abuse, drug use by her mother and the latter's sexual activities, when with her father she had been beaten. She admitted to heavy involvement in both drugs and alcohol since the age of 14, for which she had been hospitalized at Blue Hills for six months in addition to the year spent at Norwich. She had started an outpatient program at New Britain General Hospital shortly before seeing Dr. Sadler. (Id.) Because she had repeatedly engaged in such treatment efforts unsuccessfully in the past, the psychiatrist's prognosis was "guarded at best". (Id., p. 3)
Notwithstanding the guarded outlook of both clinicians, the first treatment plan prepared by DCYS following Joshua's commitment was for him to be reunified with his mother by August of 1988 and, if that could not be done, to file for termination of parental rights. The return was delayed due to Shawn's birth in July of 1988, but the subsequent treatment plan, prepared in August, remained to reunify Joshua with his mother and infant brother by November of 1988. This was based upon Cheryl's consistent visiting with Joshua, her apparent sobriety and her cooperation with the Visiting Nurse.
The reunification date for Joshua was again postponed when Cheryl and her newborn were evicted from their home in September of 1988. It took her five months to secure housing, during which time Joshua remained in foster care. In March of 1989, after 20 months in foster care, he was returned to his mother, and on May 31, 1989 Cheryl agreed to the extension of his commitment effective July 23, 1989, without prejudice to any subsequent revocation. The plan was for DCYS to monitor her continued compliance with the various supportive services that were then in place — substance abuse counselling; AA; individual counselling; Visiting Nurse visits; Time Out for Parents program — before filing for revocation in October of 1989. On May 31, 1989 Cheryl and her attorney signed a new list of expectations (State's Exh. B) reflecting the changed circumstances.
Five weeks later, on July 5, 1989, a neighbor reported CT Page 7176 that the two children — then two and one — were heard crying in their apartment since early morning with no adult in attendance. The police investigated, found this to be true, and turned the children over to DCYS. Cheryl later admitted that she had left the children alone at 1:00 a.m. to go out and buy cigarettes, but had fallen asleep and had not returned until after noon the next day. Raphael, who appeared to have rejoined the family, later said he thought Cheryl was home when he had left the apartment. The police had found the children at noon to be hot (the temperature was then 90 degrees in the apartment), dirty and dehydrated. DCYS returned Joshua to foster care, and filed a petition alleging Shawn to have been neglected, obtaining temporary custody of the younger child pursuant to subsection (b) of Sec. 46b-129. By the time of the continued hearing on Shawn's petition, the family had been accepted for intensive reunification services by the Casey program, and Cheryl had reentered the more active phase of the hospital's substance abuse program. Although neither parent appeared at the hearing on September 6, 1989 when Shawn was committed to DCYS, their attorney entered an admission on their behalf to the allegation of neglect, to Shawn's commitment to DCYS, and to the court's expectations for an eventual reunification. (State's Exh. C.). These were essentially the same as those articulated at the time Joshua's commitment had been extended three months earlier but added the further expectation that both parents would cooperate with the requirements of the Casey program. By this time Raphael had openly reentered the children's lives, and since no expectations had ever been articulated in court in his presence, a judicial review was scheduled for this purpose for November 22, 1989. Again, neither parent appeared but their attorney agreed again, on their behalf, to this list of expectations which was subsequently subscribed by both parents. (State's Exh. D.) This last list of expectations included a minimum of two visits weekly, compliance with substance abuse treatment and such parenting and/or family counseling as Casey should recommend. A clear requirement that there be "no substance abuse" was included, as well as the requirement to avoid any further involvement in the criminal justice system. It was specified — in view of the erratic nature of the parents' relationship for so many years — that the requirement for drug treatment should apply to both parents and if Raphael should refuse to participate, it was expected that Cheryl would exclude him from the home.
Despite Raphael's subsequent removal from the reunification plan because of his non-participation, and Cheryl's sporadic cooperation which was reviewed in court on January 24, 1990, and well documented by Casey (State's Exh. E, F, G), the boys were returned to her on May 28, 1990. Eight CT Page 7177 weeks later both parents were arrested after an altercation in which both appeared to various witnesses to be intoxicated and during which each assaulted the other with heavy metal objects. The children were not present, however, since Cheryl was then working nights, leaving them with a baby sitter until she left work in the mornings. On that occasion, following her arrest, she failed to retrieve the boys until nearly seven hours after the time the baby sitter expected. Nonetheless, DCYS permitted both children to remain with Cheryl, Raphael by then having again purportedly removed himself from the home. Restraining orders were obtained to prevent further contact between the parents. Despite this unpromising beginning, the August 1990 treatment plan remained the same: Eventual revocation to the mother following a satisfactory trial period at home.
Two months after this treatment plan was announced, the boys were again removed to foster care on the recommendation of the Casey professionals who had been working intensively with the family for 14 months. Reasons for this recommendation were exhaustively documented by Casey in its final report (State's Exh. H.) and in the testimony of Social Worker Bajorek (April 24, 1991 and June 5, 1991) who headed the Casey team working with the family. Bajorek testified that in the period from August of 1989 to October of 1990, the parents had not rehabilitated. There were brief periods of compliance, but, lacking motivation to make real changes, there had been none in their behaviors. Cheryl demonstrated rapid deterioration after the boys were returned in May of 1990 resulting in both physical neglect and emotional abuse of the children. When her reversion to substance abuse became apparent, Cheryl failed to acknowledge that fact or to enter the recommended treatment for it. Upon his third removal from his mother's care in his four-year life, Joshua voiced negative memories of his mother ("Mommy left me alone") and fears that these experiences would be repeated. He appeared upset at being "yelled" at because it made him feel he could never live up to her expectations, resulting in a loss of his self-esteem. After more than a year of intense work in every area of life impacting on child care (financial; substance abuse; parenting; emotional counselling), Ms. Bajorek recommended removal of the biological parents and implementation of a permanent plan for the children's care by others. She did not find that either parent had demonstrated the ability to parent alone or together, and their parenting flaws only became accentuated as the trial return home went on: Cheryl returned to drinking in July of 1990 while continuing to deny this fact to her Casey workers. She refused recommended inpatient treatment, and, on more than one occasion, the boys were seen blocks away from home, playing unsupervised, despite many reminders that this was inappropriate. Ms. Bajorek did not foresee any change CT Page 7178 likely in either parent's amenability to change. Even if either were to become wholly compliant with rehabilitative programs, it would take a minimum of two years before they could again be considered as caretakers for these children. She expressed her concern for the emotional abuse suffered by the children when their mother yelled at them, said hurtful things to them, projected her anger at the father onto them and imposed on them her unreal expectations. Such insensitivity to the needs of young children was seen as "reactive" to her own needs (testimony of April 24, 1991) suggesting that her parenting problems stemmed from her own emotional problems more than from any lack of cognitive learning. That is why Casey had insisted that Cheryl become involved in individual counselling which she had resisted for many months, claiming she did not want to discuss her own background. She did not begin counselling until January of 1990, and her attendance soon became irregular, for which a variety of reasons was given.
The psychologist who had evaluated the family in December of 1987 (State's Exh. J.) and twice subsequently (State's Exh. K, L M) testified that the children should not be returned to their parent's care although continued visitation might not be harmful for them. He found the prognosis for a sustained recovery to be poor, despite Cheryl's demonstrated ability in the past to make gains over short periods. In his opinion, three removals from her care for Joshua, and two for Shawn, was enough. She would have to demonstrate the ability to remain free of substance abuse for at least one year before she would even be considered for resuming childcare responsibilities, and even then her demonstrated inability to give her children's care a higher priority than her conflicted relationship with Raphael, or to manage the children's misbehavior appropriately on her own, would present problems. While the psychologist did not question her affection for her children, he found her ambivalent, avoidant, short tempered, having demonstrated "again and again" that she had always chosen her destructive association with Raphael over the welfare of her children. He recommended permanent placement with their present foster parents, with continued visitation with the parents so long as that appeared beneficial for them. If that is not feasible, he recommended adoption by strangers rather than any further attempts to reunite with these parents. Despite the fact that Cheryl's visits had been more consistent than Raphael's throughout the periods of foster placement, the children evidenced a closer bond with their father than with their mother. Another failed return to parental care would be "extremely difficult" for the children; even "devastating". On the other hand, if all contact with the natural parents were to cease, he predicted that the children, given their ages, would adjust well. By the CT Page 7179 time of his final evaluation in March of 1991, the parents had once again reunited and now spoke (after 18 years and four children) of marriage. At the time of that evaluation, by their own reports, Raphael had been sober for all of two weeks; Cheryl for four months, following a three week admission to UCONN Health Center after overdosing on alcohol, pills and cocaine following their children's removal in October. (State's Exh. O.) During that admission, Cheryl had also admitted to heavy marijuana use in the past (Id., discharge summary). At her most addicted, she admitted to drinking a gallon a day of hard liquor, and to one period when she used two bags of heroin daily. With this history, despite Cheryl's latest engagement in alcohol treatment, the psychologist concluded that as of March of 1991, "a durable rehabilitation on the part of the parents is unlikely" and that the proposed plan for the parents to marry, rather than assisting rehabilitation, would in fact be "a hindrance to her and a detriment to the children." (State's Exh. M. p. 23.) This reflects the prediction made by the court-appointed psychiatrist exactly three years earlier that ". . .regardless of the present treatment efforts. . .Cheryl Ch. has almost no chance of even minimally adequately caring for Joshua Ch. at any time in the future." (Report of Dr. Richard Sadler, p. 5, dated March 2, 1988.)
Conclusions of fact:
1. Cheryl Ch. has been a substance abuser for more than 18 years. All prior attempts at rehabilitation, inpatient and outpatient, have failed.
2. Under stress, her recidivism accelerates; When Joshua was first returned to her care, she returned to heavy alcohol abuse, resulting in his removal, along with his baby brother, three months later; when both boys were returned to her care in May of 1990, she was arrested two months later for a physical altercation with Raphael when both were intoxicated; when both boys were removed in October of 1990, her response was to combine an excess dose of prescribed anti-depressant medication with cocaine and a fifth of rum, leading to her hospital admission with a blood alcohol level of 230. (State's Exh. O, discharge summary.) While she associates her return to substance abuse with depression following removal of her children, in fact the record compels the conclusion that the return of her children, with the attendant stresses, has had the same effect repeatedly in the past.
3. While Raphael is seen as a negative influence upon Cheryl's behavior by Cheryl herself, as well as by various CT Page 7180 professionals in the past, she has been unable to end this relationship for nearly two decades.
4. Cheryl's own traumatic upbringing necessitates a sustained period of personal counselling before she can adequately meet the physical and emotional needs of her children. Before such counselling can take place, however, it is necessary for her to demonstrate sustained sobriety. She has been unable to sustain sobriety long enough to engage in sufficient counselling to effect any improvement in her parenting skills, despite the intensive services of community agencies for a period of more than three years.
5. Based upon this history, the prognosis for sustained sobriety made by every expert witness who testified (psychologist; Casey program counselors; alcohol abuse counselor) was poor. Consequently, the prospect for her becoming able to be a competent caretaker for these children is equally poor.
6. During the aborted trial placements at home with their mother, both boys were subject to neglect, both physical (inadequate supervision due to her continued drinking) and emotional (yelling; unreal expectations; witnessing inappropriate adult behaviors).
7. Three years after Joshua's initial removal, after intensive family reunification efforts by Casey and the return of both boys to her care, Cheryl resorted to heavy drinking. Despite months of warnings by trained professionals of the effect upon her children of this behavior, she was unable to modify it and both children were forced to be removed once again to preserve their physical and emotional safety. Cheryl's response to their removal was a more exaggerated demonstration of her response to their return: Resort to heavy substance abuse, this time including cocaine. (State's Exh. O, Admission note, p. 2.)
Respondent mother's motion to dismiss
Cheryl's motion to dismiss lack of parent-child relationship as ground for termination is granted. While the necessity of placing her sons in foster care for most of their respective lives prevented Cheryl from being the person who provided them, on a day-to-day basis, with the care, guidance or control they required, judicial modification of the plain language of this statutory ground for termination of parental rights, announced in In Re Jessica M., 217 Conn. 459, (1991), precludes a finding that such parent-child relationship does not exist so long as a child has some positive present memories CT Page 7181 or feelings for the parent. (Id. at 469.) Since Cheryl was permitted to resume the care of these children from May to October of 1990, at the time these petitions were filed it is not disputed that both children had present memories and feelings for their mother. The record establishes that some of Joshua's recollections of life with his mother include memories of his parents drinking and hitting each other (State's Exh. M, p. 21-22), and some of the children's behaviors in the foster home reflect fear of being left alone (Id. at 18) and their witnessing of inappropriate adult sexual behavior (Id.), but there is no clear and convincing evidence that their feelings and emotional ties with their mother are predominantly negative. For this reason, this ground for terminating her parental rights is dismissed.
Her motion to dismiss the second pleaded ground — denial of proper care, guidance and control by acts of omission and commission — is denied. Since their custody was assumed by DCYS, both boys have been returned to Cheryl's care on a trial basis, Joshua twice (March-July 1989; May-October 1990) and Shawn once (May-October 1990). Each time, these children were subjected to the denial of both physical and emotional nurture because of Cheryl's continued substance abuse and the resultant inability to temper her interactions with the children despite counselling and therapy. Both children were observed wandering far from home without adult supervision on several occasions before their most recent removal from Cheryl's home. Their behavior in the foster home when replaced in October of 1990, and the frightening and threatening memories of their life with their mother disclosed to the psychologist in February and March of 1991 (State's Exh. M) document the lack of proper care, guidance and control during this period. Further, because of the intensive involvement by Casey, there were professional eye-witness reports of the mother's lack of responsiveness, sleeping during the children's waking hours, verbal abuse and unreal expectations. After each trial return home, the children have had to be removed precipitously, an event which necessarily is disruptive and disturbing to children of these ages especially given their histories of multiple placements. The state has, therefore, sustained its burden of providing clear and convincing proof that during these periods of placement with their mother, both boys were denied necessary care by reason of Cheryl's failures to act (e.g. to provide alert, responsible, sober supervision) and acts of commission (e.g. drinking, fighting, yelling at the children).
Adjudication — on facts as of December 10, 1990
Adjudication that statutory grounds exist to terminate a CT Page 7182 parent's rights must be made as of the date the petition was filed or was last amended. While the petition was orally amended on June 5, 1991 to reflect the father's consent to termination of his parental rights, that amendment does not relate to Cheryl. The allegations as to her were never amended, hence the adjudicatory date is deemed to be the date the petitions were filed — December 10, 1990.
The petitioner has established by the requisite clear and convincing proof two statutory grounds for terminating Cheryl's parental rights.
1. Acts of omission and commission. The record supports, for the reasons given supra relating to her motion to dismiss, by clear and convincing evidence that these children have been deprived of necessary care, guidance and control, even after their commitments to DCYS, during those periods of time when Cheryl was given primary caretaking responsibilities as part of the implementation of the plan to reunify the family. Despite intensive reunification services provided for more than year, soon after the boys' most recent return to her care, Cheryl returned to heavy substance abuse, violent altercations with the father, failure to provide responsible supervision both in and out of the home and emotional abuse, particularly of Joshua. While there has never been any physical abuse of either child, the lack of appropriate supervision for a period of months constitutes an act of omission sufficiently serious to warrant termination of parental rights.
2. Failure to rehabilitate: On the adjudicatory date (December 10, 1990) Cheryl had recently been released from the hospital after a prolonged stay following the ingestion of anti-depressant medication, cocaine and a large amount of alcohol. Resort to substance abuse when under stress has characterized Cheryl's behavior since July of 1987 when Joshua first came to the attention of DCYS, covered with bruises and attended by his intoxicated mother. In the three and one-half years since then, every available resource for strengthening this family has been offered. Unlike many mothers in similar circumstances, Cheryl has usually not denied her need for such services or her willingness to engage in them. For that reason she has been allowed a period of time in which to rehabilitate far in excess of the 18 months envisaged by federal and state legislation as appropriate before permanency is secured for foster children. Unfortunately, much like other mothers in similar circumstances, her problems remain unimproved by these efforts at rehabilitation: She continues the polydrug abuse begun 18 years CT Page 7183 ago. She continues the erratic relationship with the children's father which began nearly as long ago. Because of her continued substance abuse, she has been unavailable for sufficient personal therapy to effect any constructive change in her parenting. The determinative question for this ground to be found is: Is the parent any closer, to becoming a satisfactory caretaker for the child on the adjudicatory date than she was when the child was removed? (Note: The fortuity of the date of commitment is not determinative. In Re Saba P., 13 Conn. App. 605, 1988). The answer in this case is an unquestionable "no". This was predicted by clinical evaluators in 1988; it was confirmed by a clinical evaluator and two professional counselors in 1990. No evidence was offered to contradict this expert testimony, nor was any evidence offered by anyone that could "encourage the belief that within a reasonable time, considering the age and needs of the child[ren] she could assume a responsible position in" their lives.
The voluntary relinquishment of parental rights by Raphael was found to be validly given on June 5, 1991. It is therefore unnecessary to find that any of the originally pleaded grounds exist for the nonvoluntary termination of his parental rights. All three nonconsensual grounds originally pleaded as to him, therefore, are dismissed without finding or prejudice.
Disposition — on facts as of last trial date (June 5, 1991)
In the six months between the date these petitions were filed and the dispositional date, Cheryl's relationship with Raphael has continued to vacillate: Midway in this period they told the psychologist they planned to remain together and marry; three months later Raphael, unilaterally, relinquished his parental rights.
As she has so often in the past, Cheryl has become re-involved with substance abuse treatment, this time at the UCONN Health Center. She completed 21-days of inpatient and has begun the outpatient follow-up. The only expert witness in substance abuse to testify did not find that fact reassuring: Given the history of the past three years, Ms. Susco testified that "obviously" the prognosis was poor, and that Cheryl's polydrug use required at least a three-month hospital stay to be followed by several months in a half-way house. Three weeks in the hospital followed by day treatment — the pattern she has attempted so often in the past — had not previously brought about any period of sustained sobriety, and could not be predicted to do so at this time. This testimony was consistent CT Page 7184 with all clinical evaluations conducted between 1987 and 1991, none of which were refuted.
Courts are not provided with crystal balls. It may be that this time Cheryl will maintain sobriety for over a year, engage in personal counselling and learn appropriate child care. But it has not happened for four years, and children now aged five and three should not be required to wait longer than that to know who will be their permanent caretakers. These children have waited far longer than the 18 months provided by law. That they have been damaged by the necessity of being moved from one caretaker to another for most of their lives is evidenced by the latest clinical evaluation and the fact that the Wheeler Clinic is now involved with the children. The psychologist testified that one more aborted trial placement with their mother could have "devastating" impact on the children. They have waited long enough.
Before a court may terminate a parent's rights, however, the six factors set forth in subsection (d) of Sec. 17a-112
must be considered:
1) Most of the evidence offered in five trial days documented the exhaustive efforts made by DCYS and the agencies to which the parents were referred to effect reunification of the family. The last of these — the intensive family reunification services of the Casey program — provided assistance in every area of concern, both before and after the boys were returned on a trial basis. Notwithstanding this effort, Cheryl's control of her substance abuse and consequently the care of her children deteriorated visibly during the nearly five months of the last trial placement at home: Cheryl returned to drinking heavily in July of 1990; the boys were seen wandering far from home twice in September of 1990; Cheryl's emotional abuse of the children was unaffected by the repeated counselling efforts of the Casey workers. No other services — other than return to foster care — could have been offered to ensure the children's physical and emotional safety.
2. Cheryl participated in all court-ordered clinical evaluations and agreed to participate in the services spelled out both in service agreements with DCYS and in the expectation lists signed at court hearings. Cheryl's inability to resolve her substance abuse problem or her conflicted relationship with Raphael has continued unaffected by such participation, agreements or expectations. CT Page 7185
3. Both boys have feelings for and emotional ties with their parents — more clearly positive in relation to Raphael than to Cheryl. But Cheryl's demonstrated inability to sustain responsible caretaking for these children for more than a matter of months requires these ties to give way to their need for welding a permanent bond with a competent caretaker without more delay. While some kind of continued contact with the parents might not be harmful after adoption, they will suffer no permanent harm if their surviving ties with their biological parents are severed permanently at this time.
4. Both Joshua, at 5, and Shawn, at 3, have not lived consistently with their mother since each was a year old. Five times Joshua has been uprooted to be placed in a different living situation because of his mother's continued substance abuse problems. For Shawn it has been three times. They are still young enough and adaptable enough so that it is predicted that one more transfer of caretaker (if the present foster parents do not adopt) may be made without lasting harm. But if they are required to spend more years triangulated between their foster parents (whom they already regard as one set of parents) and their natural parents, they will deteriorate emotionally.
5. Cheryl has verbalized, at all times, a willingness to engage in whatever rehabilitative programs are recommended for her. She has also embarked on a number of them. She has sustained her involvement in none. She has not resolved her relationship with Raphael and refuses the extensive hospitalization recommended to address her serious substance abuse problem. While she has visited faithfully and has kept in touch with foster parents and legal guardians, the underlying changes that would have to be made before her children could go home to her permanently have not been made.
6. Nothing prevented Cheryl from maintaining a meaningful relationship with these children except her own substance abuse problem and inability to resolve her personal life in a way that would be beneficial for her children. She has never been denied visitation; she has twice been permitted to regain care of her children on a trial basis; placement of the children in foster care, in each instance, was long delayed until there was a virtual certainty that the children were seriously endangered. Leaving them longer with Cheryl in the fall of 1990 would have constituted neglect by DCYS. CT Page 7186
Having considered the foregoing it is FOUND by clear and convincing proof to be in the best interests of these children for their parents' rights to be terminated so that they may know, after years as state wards, the security of a permanent home. Therefore, it is ordered that the parental rights of Cheryl Ch. and Raphael Co. in and to their children Joshua and Shawn Ch., be, and hereby are TERMINATED. And it is further ordered that the Commissioner of DCYS be appointed statutory parent for the purpose of placing the said children forthwith in adoption and that such Commissioner is further ordered to submit to this court no later than 90 days after the date of this judgment a written report as to the progress toward such adoption. If these children's adoptions have not been finalized by December 1, 1992, the said Commissioner is further ordered to submit to this court by that date a Motion to Review Plan for Terminated Child, to be in conformance with Federal Law.
Appeal
The parents have 20 days from the date of this judgment in which to take an appeal. If either decides to pursue an appeal and their counsel at trial is willing to represent them in it, this court will appoint them to act as appellate counsel at public expense until all appellate process is completed. If, however, in the exercise of their professional judgment as officers of the Superior Court, they decline to perfect such appeal because, in their opinion, it lacks merit, they are not required to do so but may instead simultaneously file a timely motion to withdraw and another motion to extend the appellate period to the full maximum of 40 days as permitted by law. Such motions, if unopposed, will be granted ex parte and a new attorney appointed to review this record and make an independent determination of the merits of such appeal. If the second attorney determines it lacks merit, he or she is required promptly to submit to the court in writing the reasons for this opinion. The parent will then be informed by the court clerk that there is the balance of the 40 days in which to secure their own counsel for the purpose of taking such appeal, who may, if qualified, be appointed by the court to be compensated by the state. This procedure conforms to the principles of Douglas v. California, 372 U.S. 353 (1963), adopted for Connecticut in Fredericks v. Reincke, 152 Conn. 501
(1965), in which it was held to satisfy an indigent criminal defendant's constitutional right to counsel on appeal if, after the public defender at trial notifies both client and court that "he could not conscientiously proceed with the appeal," another attorney is appointed to consider the merits of the appeal and comes to the same conclusion. Even a convicted CT Page 7187 criminal defendant "cannot demand that the trial court find and appoint other counsel who will advise such appeal" after the second public defender has declined to do so. Fredericks v. Reincke, 152 Conn. at 505. If such procedure satisfies the sixth amendment right to counsel where the only conflicting interests are those of a defendant who seeks review of his conviction and of the state which has a legitimate interest in avoiding the expense and judicial burden of meritless appeals, it is a fortiori appropriate where there are interests of third parties involved: those of the child whose interest in achieving permanent nurturing parents is entitled to at least as great a degree of consideration as those of his parent whose right to raise him, brought into question because of past acts of omission, is at issue. Even an unsuccessful appeal could delay permanent planning for these children for years since no child may be adopted until the appellate process is exhausted and the termination order final.
If an appeal should be taken, the judgment of termination shall be stayed during its pendency, but throughout this period all decisions made by DCYS, as the children's continuing legal guardian, as to contacts with their natural parents shall be based solely upon the children's best interests, not upon the parents' or the lingering possibility of an eventual reunification. Whatever obligation is imposed upon DCYS by federal and state law to make continuing efforts to reunite committed children with natural parents ends upon a judicial finding that grounds exist to terminate parental rights.
Entered at Plainville this 26th day of August, 1991.
Brenneman, J.